UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES MOSES JR.,<br>     Plaintiff,<br><br>     v.<br><br>ST. VINCENT'S SPECIAL NEEDS<br>CENTER,<br>     Defendant. | No. 3:17-cv-1936 (SRU) |

## MEMORANDUM OF DECISION

In September 2012, James Moses Jr. ("Moses") lost his job as a program assistant/driver with St. Vincent's Special Needs Center ("St. Vincent's), an organization that provides services to individuals with developmental or cognitive disabilities. At the crux of this case, brought pursuant to Title VII (42 U.S.C. § 2000e *et seq.*), is the basis for that termination. Moses, who filed this action in 2017, claims that he was terminated in retaliation for making a complaint of discrimination to his supervisor. St. Vincent's denies that any such retaliation occurred and contends instead that Moses's termination followed a pattern of misconduct and insubordination; in fact, according to St. Vincent's, the termination decision preceded Moses's complaint of discrimination. In January 2022, after dismissing the bulk of Moses's claims on summary judgment, I held a two-day bench trial on the claim for retaliatory discharge. For the reasons set forth below, Moses has failed to show by a preponderance of the evidence that he was terminated in retaliation for engaging in protected conduct. As a result, judgment shall enter in favor of St. Vincent's.

**I.  Procedural History**

Moses, proceeding *pro se*, filed this action in November 2017, principally alleging that he was discriminated against on the basis of gender during the course of his employ at St.

Vincent's; that he was retaliated against for complaining about that discrimination; and that his former supervisor defamed or slandered him during the course of the investigation into those complaints. *See* Compl., Doc. No. 1. On December 13, 2017, United States Magistrate Judge William Garfinkel granted Moses's motion for leave to proceed in forma pauperis, but recommended that the case be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B). Thereafter, Moses filed an amended complaint setting forth additional facts in support of his claims. *See* Doc. No. 10. In April 2018, I directed service of the amended complaint on St. Vincent's. In April 2020, following discovery, St. Vincent's moved for summary judgment, a motion I granted in substantial measure.[1]

In January 2022, I held a two-day bench trial to address Moses's Title VII claim for retaliatory discharge—the only claim to survive summary judgment. Moses, who discharged court-appointed counsel a few weeks prior to trial, proceeded *pro se*, and testified as a witness at trial. Beth Jezierny ("Jezierny"), former Director of Adult Services at St. Vincent's, and Sarah O'Brien ("O'Brien"), Program Supervisor for the adult day program, also testified. I additionally admitted 27 exhibits submitted by the parties during the course of that trial. *See* Doc. No. 118.

---

[1] In its memorandum in support of the motion for summary judgment, St. Vincent's argued that Moses failed to properly exhaust his retaliation claim prior to bringing it in federal court. After careful review of the record, I determined that the claim was subject to a recognized exception to the exhaustion requirement because it "would fall within the scope of the [CHRO] investigation which can reasonably be expected to grow out of the charge that was made." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003). More specifically, in light of the statements set forth in the affidavit Moses submitted to the CHRO, an investigation of Moses's claim of discriminatory discharge would entail consideration of the stated reasons for the termination decision and the events of September 7. His supervisor's notes describing that day (produced, according to Moses, during the CHRO investigation) detail the complaint of discrimination that morning. Accordingly, the investigation into Moses's claims of discriminatory discharge would reasonably involve consideration of whether his complaint played a role in the termination decision. *See Amin v. Akzo Nobel Chems., Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) (summary order); *see also Gomes v. AVCO Corp.*, 964 F.2d 1330, 1334-35 (2d Cir. 1992). Moreover, the parties represent that, in 2014, Moses's CHRO complaint *was* amended to include the retaliation claim. *See* Am. Compl., Doc. No. 10; Compl., Doc. No. 1; L.R. 56(a)(1) Stmt. at ¶ 57; Trial Mem. Doc. No. 102 at 2. Because St. Vincent's did not set forth evidence at trial in support of the affirmative defense of failure to exhaust, I do not address the issue further in this order.

This order constitutes my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II. Facts

### 1. Background

St. Vincent's serves a community of individuals with significant medical or developmental delays. Tr. at 178:11-18. One of the services St. Vincent's offers is the adult day program, where participants engage in various activities of daily living, cognitive activities, and attend community outings accompanied by St. Vincent's staff members. *Id.* In December 2009, Moses was hired by St. Vincent's as a program assistant/driver for the day program. *Id.* at 9:15-22; 11:25; 12:1. In that role, Moses's tasks were primarily comprised of picking up individuals along a set "route" each weekday morning and driving them to the Center to attend the day program. *Id.* at 182:1-10. During the day, Moses assisted in "program areas…performing tasks including activities of daily living, assisting in toileting, assisting in feeding, [and] performing activities." *Id*. In Moses's first few months at St. Vincent's, he worked in Building 1, under the supervision of O'Brien. *Id.* at 9:23-25; 10:1-2. At some point thereafter, he moved to Building 2, where he reported to Frances Hernandez ("Hernandez"). *Id.* at 15:4-5; 9-11.

For the first six months of his tenure at St. Vincent's, Moses was placed on temporary probation, which was apparently customary for new employees. *Id.* at 9:23-24. In June 2010, he received a positive performance evaluation from O'Brien, and was informed that he had "passed" the probationary period and would stay on as a program assistant/driver. *Id.* at 10:6-15. Jezierny recalled that Moses was "generally very good with the participants that we served. He was on time coming to work…responsible and available for transportation to meet the needs of the individuals. He would always greet them and include participants in conversations which is

3

always important." *Id.* at 183:5-11. O'Brien testified similarly, noting that Moses "was really great to our participants." *Id*. at 121:8-9. She also recalled, however, that Moses "could be combative to other staff." *Id.* at 121:9.

In 2011, Moses received a written performance review for the period between July 1, 2010 and June 30, 2011. Def.'s Ex. V. The review was organized around a variety of performance indicators, and an employee received a ranking—ranging from "needs improvement" to "exceptional"—in each category. *Id.* Moses received a ranking of "exceptional" in the category of "patient/customer experience," and comments on the form praise his "respectful" interactions with program participants. *Id.* He received a rating of "needs improvement," however, in the categories of "communications, oral/listening/written" and "core values/standards of behavior." *Id.* Written comments on the review provide, "[Moses] will work on respectful communication with staff and standards of behavior." *Id.* O'Brien, who completed the review, explained that Moses often spoke to staff in a sarcastic way and "that there had been a lot of problems with discussions with him." Tr. at 127:2-7; 128: 1-6.

    2.    <u>Disciplinary Incidents</u>

Two disciplinary incidents, which occurred about a month apart, are especially significant in this case. First, on August 16, 2011, Moses received a "verbal warning," memorialized in a written Disciplinary Action Form, for "[u]sing a company vehicle for personal use." Pl.'s Ex. 2. Specifically, the form provides: "You were observed on August 16, 2011 going through a drive-thru window on company time after your afternoon run." *Id*. Language on the form additionally warns that "further violation of this or any other agency policy will result in

disciplinary action, including termination."[2] *Id.* Although the form includes a space for an employee's signature, a handwritten notation on the form provides that Moses "refuse[d] to sign." *Id.* At trial, Moses explained that he refused to sign the form because he disagreed with the allegations therein; although he conceded that he had stopped at a McDonald's on the day in question, he recalls that he did so merely to use the bathroom and did not attempt to go through the drive-through, nor did he purchase a meal. *Id.* at 19:4-11; 142:11-12.

On September 16, 2011, Moses received a second disciplinary action form citing him for "[i]nsubordination. Refusal to move your vehicle when asked by the Administrator. You also exhibited verbally offensive and confrontational behavior toward the Administrator." Pl.'s Ex. 3. Like the first, that form warns that further violations of "this or any other agency policy will result in disciplinary action, including termination." *Id.* Also like the first, that form contains a handwritten notation indicating that Moses "refused to sign." *Id.* At trial, Moses testified in detail about the incident referenced in that Disciplinary Action Form, recalling that a dispute had arisen after Hernandez asked him to move his car from a particular parking spot so that a coworker could park there. Tr. at 23:1-18; 28:23-25; 29:1. Moses, who recalled being told at the time of hiring that there were no assigned parking spots, refused to move his vehicle. *Id.* at 24:1-4; 10-13. At trial, Moses conceded that he had refused to move his car despite Hernandez's requests, but maintained that he had been neither verbally offensive nor confrontational during the conversation. *Id.* at 27; 28: 1-5.

3.      The Events of September 5

---

[2] Although there was, apparently, no written policy regarding employees' personal use of company vehicles, O'Brien testified that employees were aware that any non-work-related stops with a company vehicle had to be "preapproved." Tr. at 132:2-9.

The next relevant incident between Moses and Hernandez occurred on September 5, 2012, more than a year later. When Moses arrived at work that morning, he was informed that Hernandez was making changes to certain drivers' pick-up routes because new participants were being added to the day program. *Id.* at 29: 10-21. Hernandez informed Moses that he would be assigned a new route, and that he would receive training from another coworker for a few days before driving the route alone. *Id.* O'Brien, who was in the room when Moses was informed of the route change, recalled that Moses was "not particularly happy" with the new assignment, and that he was angry that his route had been changed. *Id.* at 133:7-17. Moses disputed that characterization; although he conceded that he was displeased with the new route, *see id.* at 91:9-14, he testified that he did not speak to Hernandez in an aggressive or unprofessional manner. *Id.* at 32:4-13. He did recall, however, that during the conversation regarding his new route, he requested approval from Hernandez to take two days off later in the month. *Id.* at 30:24-25. Hernandez granted the request with respect to the first day but denied it with respect to the second day. *Id.* at 30:24-25; 31:1-2. Moses was "bothered" by her refusal, but testified that he "did not become emotionally upset," *see id* at 31:7-10; according to Moses, "there was no incident." *Id* at 32:18. Although Hernandez did not testify at trial, her notes detailing the September 5 conversation (which Moses maintains were produced at some point during the subsequent investigation by the Connecticut Commission on Human Rights and Opportunities ("CHRO")) read somewhat differently; in particular, Hernandez described Moses's behavior as "extremely loud and disrespectful." Pl.'s Ex. 7.

Jezierny was not present during the conversation in Hernandez's office on September 5, 2012. She testified, however, that Hernandez called her that morning to report that Moses had been "insubordinate, disrespectful, challenging and rude to a reassignment of duties." *Id.* at

192:21-25; 193:1-3. Following her conversation with Hernandez, Jezierny called Walicia McNeil ("McNeil"), an employee of St. Vincent's Human Resources partner, and recommended that Moses's employment be terminated. *Id.* at 192: 9-12; 193:18-25. Although Jezierny explained that the possibility of termination had been previously discussed as part of a conversation about "progressive discipline," she did not formally recommend termination until that morning. *Id*. at 194:1-8; 193:24-25. During the conversation with McNeil, Jezierny also requested that Hernandez be "supported with a representative from human resources as well as a representative from security" when she informed Moses of the decision. *Id.* at 195:4-9. According to Jezierny, it was important to have someone from security present for the conversation "based on Mr. Moses's behaviors towards Ms. Hernandez." *Id.* at 195:10-14.

At some point after their conversation, McNeil followed up with Jezierny to report that a member from the security team would be available on September 7 and suggested that St. Vincent's inform Moses of the termination decision on that date. *Id.* at 195:25; 196:1-2. McNeil advised Jezierny that, in the interim, St. Vincent's should "continue to do business as usual, to not make any indication that the decision to terminate was forthcoming." *Id.* at 196:10-12. At some point, a discharge notice was prepared, which Jezierny "reviewed [] verbally" over the phone with Hernandez. *Id.* at 203:22-24. That form is signed only by Hernandez and is not dated. *See* Pl.'s Ex. 5. According to Jezierny, however, the form was prepared on either September 6 or September 7. Tr. at 222:7-8. Jezierny additionally testified that she involved only McNeil and Hernandez in the termination decision. *Id*. at 195:19-22.

At trial, Jezierny testified consistently that she recommended Moses's termination to McNeil on the morning of September 5, following her conversation with Hernandez about an incident with Moses that morning. During subsequent proceedings before the CHRO, however,

7

Jezierny described the events preceding the termination differently. Pl.'s Ex. 4; *see also* Tr. at 193:8-13. More specifically, during a fact-finding conference held on June 28, 2016, Jezierny was asked whether Hernandez had reached out to her to discuss an incident with Moses on September 5. *Id.* Jezierny responded that she was unfamiliar with an incident on that date. *Id.; see also* Tr. at 227: 3-8; 224:24-25. Asked about that statement at trial, Jezierny explained that she "may have been flustered initially" during the fact-finding conference and made that statement in "error," reiterating that the decision was, in fact, made on September 5, following her conversation with Hernandez. *Id.* at 228: 1-3; 14-15; 9-11. She additionally testified that, at the time the termination decision was made, she was not aware that Moses had at any point complained of discrimination. *Id.* at 199: 6-21.

### 4. The Complaint

On September 6, Moses reported to work at his usual time and received training from another coworker on the new pick-up route. *Id.* at 39:15-17. On the morning of September 7, however, he arrived at work without his employee badge. *Id.* at 40:1-7. As was the procedure when employees arrived at work without their badges, he went to Hernandez's office so that she could check him in for the day. *Id.* at 40:9-12. One of Moses's coworkers—identified at trial only as "Melanie"—was in Hernandez's office when Moses arrived. *Id.* at 40: 13-16; 42:21. Moses recalls that, as she was checking him in, Hernandez chatted with him about training for the new route, asking him whether he would be prepared to drive it alone beginning Monday, September 10. *Id.* at 40:17-19. Moses explained to Hernandez that the new route was very long, and suggested that he might need a few additional days of training before driving the route alone. *Id.* at 40: 20-25; 41:1-3. Hernandez warned that he would need to begin driving the route the following Monday, and suggested that he "learn it quickly." *Id.* at 41:2-3. Moses then turned to

8

Melanie and inquired about her new route assignment; when she described the route to him, Moses told her that she "got it easy" in comparison to the route he had been assigned. *Id.* at 41:8-13; 17-18.

At that point, Hernandez interrupted the conversation, directed Melanie to leave the office, and asked Moses whether there was some sort of issue with his new route assignment. *Id.* at 41:14-19; 42:21-23. Moses explained that the new route was "too long,"—he had anticipated that he would be assigned a "better route." *Id.* at 42: 24-25. Hernandez, who Moses describes as short-tempered, got upset and asked Moses what was wrong with him. *Id.* at 43:3-10. Moses explained that he felt that he was being discriminated against in terms of the assignments he had been given as compared to those his female coworkers had received, and told Hernandez that he wanted to file "a complaint for discrimination." *Id.* at 43: 11-19. Hernandez's description of the conversation that morning similarly provides: "9/7/2012 Friday am., [Moses] came in and said 'so that's going to be my new run right?' Yes[,] it is I said. Then he said, so MB doesn't have any tie downs to do….I asked [MB] to step out as he was dragging her into this issue. 'I'll fix this; you are discriminating to me.' I did feel that he was threatening me with what he could do." Pl.'s Ex. 7.

Following his conversation with Hernandez, Moses left the office and joined another coworker, Sue Cato ("Cato"), who was accompanying him on the new driving route, in the company van. *Id.* at 136:1-3. At some point during the drive, Moses complained to Cato that Hernandez was discriminating against him by assigning him a more difficult pick-up route than a female coworker. Pl.'s Ex. 9. When Moses and Cato returned to the Center later that day, Cato shared the details of their conversation with O'Brien. Tr. At 136:4-5. Cato's written statement, apparently transcribed by O'Brien, provides: "[Moses] started talking about Frances [Hernandez]

9

and how he was being discriminated against…[Cato] told him it sounded…like he just did not want to do the run and I said if you are that unhappy then just quit! He said he would not quit until he had another job." Pl.'s Ex. 9.

Around 3:00 p.m. that afternoon, Hernandez asked Moses to step into a conference room near her office, and informed him that he was being terminated from his position for insubordination. Tr. at 44:10-15. According to Jezierny, she, O'Brien, Hernandez, McNeil, and a security guard were all present, *see id.* at 198:1-3; Moses, however, does not recall McNeil attending the meeting. *Id.* at 230:6-7. Jezierny testified in some detail about Moses's behavior during the meeting, recalling that he was angry about the termination decision, and that he "again became disruptive. He again challenged Ms. Hernandez. He would speak over her questioning why he was—why he was being terminated. He leaned over…the table and began pointing at all of us asking again why, what was the reason he was being terminated for, appearing to, again, try to invade or intimidate to our personal space." *Id.* at 198:16-24. She further testified that Moses did not raise any concerns of discrimination or retaliation during the meeting. *Id.* at 199. At trial, Moses disputed that he had behaved in a confrontational or aggressive way, *see id*. at 236: 8-10; he does recall, however, asking Hernandez to identify a time when he had refused to follow instructions given by a supervisor. *Id.* at 44:16-24. Hernandez did not provide an example. *Id.* Following the meeting, Moses left the building without further incident. *Id.* at 44:25.

Moses subsequently filed a complaint with the Department of Labor with regard to his termination; thereafter, he filed a complaint with the CHRO of Connecticut claiming that he had been discriminated against on the basis of gender.

### III. Discussion

    1.    Standard of Review

To prevail at trial in a civil action, a plaintiff must prove each element of his or her claim by a preponderance of the evidence. *Barr Rubber Prods. Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1120 (2d Cir. 1970). That standard is "no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996); *see also Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997) ("To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true.") (quoting 4 L. Sand *et al., Modern Federal Jury Instructions* P 73.01, at 73-4 (1997)). At a bench trial, the district court sits as the trier of fact, and is therefore "entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness" *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011), and "to decide whose testimony should be credited." *Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

    2.    <u>Retaliatory Discharge Under Title VII</u>

Following summary judgment, Moses's only remaining claim is one for retaliatory discharge in violation of section 2000e-3(a) of Title VII, which "forbids any employer from 'discriminating against any of [its] employees . . . because he has made a charge, testified, assisted, or participated in any manner in a [Title VII] investigation, proceeding, or hearing.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 172 (2d Cir. 2005) (quoting 42 U.S.C. § 2000e-3(a)). Claims for retaliatory discharge in violation of Title VII are generally analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which provides "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). In line with the remedial purpose of Title VII, and

recognizing that "direct evidence of intentional discrimination can be elusive," the framework entitles a plaintiff who "proves certain predicate facts" (in other words, establishes a *prima facie* case) to "an inference or presumption of intentional discrimination." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1966 (2021) (Gorsuch, J., dissenting) (cleaned up). To establish a *prima facie* case in the context of a claim for retaliation, a plaintiff must demonstrate that: (1) he or she participated in a protected activity; (2) the defendant knew of the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. *Blanc v. Sagem Morpo, Inc.*, 394 F. App'x 808, 809 (2d Cir. 2010) (citing *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003)).

If a plaintiff carries her burden of making out a *prima facie* case, the burden shifts to the defendant to articulate a "legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at 173. Once a defendant meets that burden of production, however, "the presumption of retaliation dissipates." *Id.; see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) ("Upon the defendant's articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."). To prevail, a plaintiff must then set forth evidence to demonstrate that "his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *see also Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013); *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) ("if the defendant provides [a legitimate] explanation, the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action") (cleaned up). Said differently, a plaintiff

ultimately bears the burden of demonstrating that, in the absence of retaliatory motive, the adverse employment action would not have occurred. *Kwan*, 737 F.3d at 846.

Direct evidence of retaliatory animus is not necessary; rather, a plaintiff can establish that retaliation was a but-for cause of a termination decision by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non[]retaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.; see also EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir. 1994) (noting that a juror can reasonably view an employer's changing explanations as "pretextual, developed over time to counter the evidence suggesting…discrimination"); *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156-57 (2d Cir. 2000) ("evidence satisfying the minimal *McDonnell Douglas* prima facie case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination"). Although the falsity of an employer's proffered explanation may be sufficient to "permit the trier of fact to conclude that the employer unlawfully discriminated," the trier of fact must believe the plaintiff's explanation that retaliation was the true motivator. *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 148 (2000); *see also Tsaganea v. City Univ. of New York, Baruch Coll.*, 441 F. App'x 12, 15 (2d Cir. 2011) ("[I]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of retaliation") (summary order) (quoting *James*, 233 F.3d at 156).

In the case at bar, there is no dispute that Moses belongs to a protected class (male) and that he suffered an adverse employment action (termination). In my view, Moses has additionally met his burden to show, by a preponderance of the evidence, that he participated in a protected activity when he complained of discrimination to his direct supervisor on September 7.

Assuming *arguendo* that he similarly carried his burden with respect to causation, St. Vincent's has clearly articulated a legitimate, non-retaliatory reason for his termination. Specifically, St. Vincent's proffers that the termination decision followed multiple incidents of insubordination or violations of company policies, some of which were memorialized in Employee Disciplinary Action Forms. *See* Pl.'s Ex. 2; Pl.'s Ex. 3. Violations of company policies or insubordinate behavior are, of course, valid reasons to terminate an employee. *See, e.g., Bentley v. AutoZoners, LLC*, 2018 U.S. Dist. LEXIS 226665, at *25 (D. Conn. July 18, 2018) (violation of employee "Code of Conduct" constituted a "legitimate, non-discriminatory reason for [employee's] termination"); *Labonia v. Doran Assocs., LLC*, 2004 U.S. Dist. LEXIS 17025, at *41 (D. Conn. Aug. 25, 2004) (violation of "Personnel Policy" constituted a legitimate, non-discriminatory reason for employer's decision to terminate plaintiff); *McNeil v. Vradenburgh*, 2021 U.S. Dist. LEXIS 36632, at *18 (S.D.N.Y. Feb. 26, 2021) ("multiple instances of insubordination by Plaintiff towards his supervisors, conflicts with fellow co-workers, and untruthfulness in the course of the investigations are legitimate non-discriminatory reasons" for termination) (collecting cases).

Given that St. Vincent's has met its burden, the critical question is whether Moses has demonstrated, by a preponderance of the evidence, that he was subjected to intentional retaliation.[3] *See Aikens*, 460 U.S. at 715 ("Where the defendant has done everything that would

---

[3] The Supreme Court in *Aikens* made clear (following a bench trial in which the District Court denied a motion to dismiss at the close of the plaintiff's *prima facie* case) that, following trial on the merits, a court should not focus on the elements of a *prima facie* case at the expense of reaching the ultimate issue of discrimination. *Aikens*, 460 U.S. 714-15, n.4. Although the Second Circuit has clarified that a jury is not to be instructed on the *McDonnell Douglas* framework, district courts in this Circuit continue to deploy the framework in the context of a bench trial, where the judge "acts both as a determiner of whether a case meets the legal requirements for decision by a fact-finder and as a fact-finder." *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994); *see also Wood v. Sempra Energy Trading Corp.*, 2005 U.S. Dist. LEXIS 33637, at *18 n.7 (D. Conn. Dec. 9, 2005) ("While the Second Circuit has indicated that the *McDonnell Douglas* framework is not to be used in a jury charge and the Supreme Court has held that a bench ruling should not employ the *McDonnell Douglas* analysis where it obscures the ultimate issue of whether the plaintiff has carried his or her burden, the Second Circuit still appears to consider this framework to be a helpful and

14

be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant."); *see also Coffey v. Dobbs Int'l Servs., Inc.*, 170 F.3d 323, 326 (2d Cir. 1999) ("Because this case has been fully tried on the merits, we need not determine whether [plaintiff] established a prima facie case…[r]ather, we proceed directly to the ultimate question of discrimination.") (cleaned up); *French v. Cnty. of Erie*, 2018 U.S. Dist. LEXIS 209679, at *16 (W.D.N.Y. Dec. 12, 2018) (passing over the question of whether plaintiff made out a *prima facie* case where defendant articulated a legitimate, non-discriminatory reason for the adverse employment action). Of course, "[n]one of that means the plaintiff's indirect evidence of discrimination also disappears." *Goldman Sachs Grp., Inc*, 141 S. Ct. at 1966-67; *see also Reeves*, 530 U.S. at 143 ("although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual") (cleaned up).

To show that the proffered reason for his termination was pretextual, Moses principally relied at trial upon the inference that can be drawn from close temporal proximity between his complaint of discrimination and his termination; and evidence that the proffered reasons for his termination were false or contrived. In particular, Moses disputed that any confrontation with

---

appropriate guide for a bench trial ruling.") (cleaned up); *Goonewardena v. State Workers Comp. Bd.*, 258 F. Supp. 3d 326, 337 (S.D.N.Y. 2017), *aff'd*, 788 F. App'x 779 (2d Cir. 2019) (employing framework); *but see Dinkins v. Suffolk Transp. Serv.*, 2010 U.S. Dist. LEXIS 71242, at *24 (E.D.N.Y. July 15, 2010) (declining to apply framework at bench trial following summary judgment); *Fullard v. City of N.Y.*, 274 F. Supp. 2d 347, 354 (S.D.N.Y. 2003) ("At trial, the responsibility of the fact-finder is simply to decide whether an impermissible factor was a motivating factor in the adverse employment action.") (cleaned up); *Am. Fed'n of State, Cnty. & Mun. Emples. v. Cnty. of Nassau*, 799 F. Supp. 1370, 1411 (E.D.N.Y. 1992) ("once the defendant has presented evidence, the question of whether the plaintiff has established a *prima facie* case of discrimination is irrelevant"); *see also Kovacevich v. Kent State Univ.*, 224 F.3d 806, 825 (6th Cir. 2000) ("a district court or an appellate court must focus on the ultimate question of discrimination rather than on whether a plaintiff made out her prima facie case"). Accordingly, I touch briefly on the sufficiency of Moses's *prima facie* case before turning to the "ultimate question of discrimination *vel non*." *Aikens*, 460 U.S. at 714.

Hernandez occurred on September 5, and pointed to Jezierny's testimony before the CHRO that she did not recall an incident on that date to argue that any such incident was fabricated in order to conceal retaliatory animus. Although those are certainly viable routes for proving retaliatory discharge, after careful consideration of the witness testimony and other evidence presented, I find that Moses has failed to meet his burden to prove retaliatory discharge by a preponderance of the evidence.

With respect to temporal proximity, Moses testified that he was terminated the very same day he complained to Hernandez of discriminatory treatment, and Hernandez's notes reflect the same. *See* Pl.'s Ex. 7. Moses further testified that he received training on September 6 and 7 for the new pick-up route, and that Hernandez informed him on September 7 that he would begin driving the new route the following Monday, intimating that no termination decision had yet been made; he also pointed out that O'Brien was not aware of the termination decision as of September 5. Finally, Moses relied on the termination notice, which, unlike the notes taken by O'Brien and Hernandez recording each detail of prior minor infractions, was not dated, and was signed only by Hernandez. Pl.'s Ex. 5.

At trial, however, Jezierny testified—credibly and consistently, in my view—that she formally recommended Moses's termination to McNeil on September 5, two days prior to the date Moses complained to Hernandez about discriminatory treatment. She also explained why Moses was not immediately informed of the termination decision, recalling that it took some time to arrange for both McNeil and a security guard to attend the meeting. According to Jezierny, McNeil further advised that St. Vincent's should take care not to give any indication in advance that the decision had been made, and Moses therefore continued to work—and receive training for the new pick-up route—on September 6 and 7.

On the whole, I found Jezierny's testimony very persuasive. Certainly, the lack of documentation memorializing her conversation with Hernandez or McNeil on September 5 was surprising, as was the fact that the termination form, unlike the prior Disciplinary Action Forms, was not dated. But aside from that apparent oversight, the only indication that the decision may have been made later than September 5 consisted of Moses's testimony that he received training for a new pick-up route on September 6 and 7; that Hernandez suggested on September 7 that he should prepare to begin driving the route the following Monday; and that O'Brien was unaware on September 5 that the termination decision had been made. As discussed, however, Jezierny set forth a credible explanation for the delay in informing Moses of the decision, and there is nothing particularly unusual in an employer choosing to wait until an appropriate time and gather the necessary parties to formally terminate an employee. Moreover, neither O'Brien nor Jezierny suggested that O'Brien was consulted about the termination decision, and the fact that O'Brien was not aware on September 5 that the decision had been made is therefore not dispositive. In sum, credible evidence that the termination decision was made in advance of September 7 undercuts the salience of the temporal proximity between Moses's complaint to Hernandez and the date he was terminated.

But even setting aside the issue of timing—which, in this case, is essentially dispositive—I am not persuaded that the proffered reason for the termination was mere pretext for retaliatory animus. Although there is no dispute that Jezierny's 2016 statement before the CHRO was inconsistent with St. Vincent's later explanation that the termination decision was made on September 5 following an incident with Hernandez, Jezierny testified credibly at trial that although she was "flustered" during the fact-finding conference, accounting for an "error" in her statement, "the [termination] decision was made on September 5." Tr. at 228:1-2; 14-15; 2-3.

17

She further explained that the possibility of termination was discussed prior to September 5, in connection with other disciplinary incidents, and that Hernandez's interaction with Moses on September 5 was, in essence, the final straw. Moreover, I do not find it particularly unusual that Jezierny might not have immediately recalled the September 5 incident when asked about it in 2016, more than four years later. On the whole, that one remark was simply not enough, considered in the context of the other evidence presented, to allow me to infer "that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147.

Further, although Moses testified that he did not speak to Hernandez in an insubordinate or disrespectful way during the conversation regarding his new route assignment, he did testify that he was unhappy with the new route assignment. O'Brien testified similarly; although she did not offer much detail with regard to the conversation between Moses and Hernandez, she did recall that Moses was clearly unhappy with his new route assignment and noted that he was angry with Hernandez. Certainly, Hernandez may have overreacted, or blown the interaction out of proportion in her subsequent call to Jezierny. But Title VII is "decidedly not interested in the truth of the allegations against plaintiff…the factual validity of the underlying imputation against the employee is not at issue." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006); *see also Ya-Chen Chen*, 805 F.3d at 73 ("Title VII is not an invitation for courts to sit as a super-personnel department that reexamines employers' judgments.") (cleaned up); *see also Villa v. CavaMezze Grill, LLC,* 858 F.3d 896, 903 (4th Cir. 2017) ("whether the termination decision was wise, fair, or even correct is immaterial") (cleaned up) (collecting cases). The question is instead whether Moses has set forth sufficient evidence from which I can infer that, in the absence of making a complaint of discrimination, he would not have been terminated. *Zann Kwan*, 737 F.3d at 846. He has failed to carry that burden.

## IV.     Conclusion

Because Moses has failed to prove by a preponderance of the evidence that he was terminated in violation of Title VII, judgment shall enter for the defendant, St. Vincent's. The clerk is directed to close the case.

So ordered.

Dated at Bridgeport, Connecticut this 31st day of March 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge